**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

**GLYNDA ROSS,**

  *Plaintiff,*

   **v.**

**PUNEET CHOPRA,** *et al.,*

  *Defendants.*

\*      

\*

\*      **Case No.: 8:19-cv-00092-PWG**

\*

\*

\*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION AND ORDER**

Plaintiff Glynda Ross filed this action against Dr. Puneet Chopra and her former employer, Doctors Community Hospital ("Doctors"), alleging that Dr. Chopra sexually harassed, assaulted, and battered her in November 2017. ECF 29, Second Amended Complaint ("SAC"). Ms. Ross alleges that Doctors took no action in response to her reports of Dr. Chopra's inappropriate behavior, and instead placed Ms. Ross on administrative leave and constructively discharged her as a result of her complaints. *Id.* at ¶ 1. Against Dr. Chopra, Ms. Ross seeks actual damages, compensatory damages, punitive damages, and emotional damages for the alleged assault and battery. *Id.* at ¶¶ 50–59. Against Doctors, she seeks actual damages, compensatory damages, punitive damages, and emotional damages based on three theories of employment discrimination under Title VII. *Id.* at ¶¶ 87–115.

Pending before me are the Defendants' respective Motions for Summary Judgment. ECF 80, Chopra MSJ; ECF 81, Doctors MSJ.[1] I have reviewed the parties' filings and determined that

---

[1]  Both Motions are fully briefed. *See* ECF 86, Opp. to Doctors; ECF 88, Doctors Reply; ECF 87, Opp. to Chopra; ECF 89, Chopra Reply.

a hearing is unnecessary. *See* Local Rule 105.6. For the reasons explained below, Dr. Chopra's Motion is GRANTED in part and DENIED in part, and Doctors's Motion is GRANTED in part and DENIED in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Ms. Ross began working at Doctors as a night shift nurse in 2009. Opp. to Doctors at 2; Doctors MSJ at 2. In 2015, she was promoted to Nursing Director of the Telemetry and Observation units, and it was in her new capacity that she first met Dr. Chopra, an emergency room physician, Chairman and Medical Director of Emergency Services, and Medical Director of Observation for Doctors. *Id*; Doctors MSJ at 4. Dr. Chopra is not Doctors's employee, but is employed by Emergency Medical Associates ("EMA"), an entity that contracts with Doctors to provide staffing for emergency medicine, observational medicine, and hospitalist medicine. Doctors MSJ at 4.

*The Gala*

The Doctors Community Hospital Foundation held its annual gala at the Gaylord Hotel at the National Harbor on November 4, 2017 (the "Gala"). *Id*. at 4–5. As he did every year, Dr. Chopra purchased a table for this event and invited several EMA physicians and Doctors managers to attend with a guest. *Id.* Dr. Chopra invited Ms. Ross and a guest to attend the 2017 Gala, and Ms. Ross accepted one ticket. *Id.*

Sometime before the Gala, Ms. Ross testified in her deposition that she had "second thoughts" about attending because she felt uncomfortable around Dr. Chopra. ECF 81-3, Ross Dep. at 69:9–13. She testified that Dr. Chopra had repeatedly asked her to spend time with him outside of work and did not "take the hint" when she refused. Ross Dep. 107:3–109:6. Ms. Ross testified that on the day before the 2017 Gala, she explained this to her supervisor, Lisa Hurley,

and told her that she had decided not to attend. *Id.* at 115:4–116:3. Ms. Hurley remembers the conversation differently, and testified that she believed Ms. Ross did not want to attend the Gala due to the long drive and the fact that she did not have a dress to wear. ECF 81-3, Hurley Dep. at 135:1–18. The day before the Gala, Ms. Ross texted Dr. Chopra and told him she would not be able to attend. Ross Dep. at 113:21–114:4.

Both Ms. Hurley and Dr. Chopra encouraged Ms. Ross to attend the Gala after she informed them that she was no longer planning to go. Ross Dep. at 116:14–15; 117:9–14; 119:1–120:6. Ms. Hurley encouraged her to take advantage of the networking opportunity, and both Ms. Hurley and Dr. Chopra told Ms. Ross that she was putting Dr. Chopra in a difficult position by cancelling at the last minute and leaving an empty spot at his table. *Id.* Ms. Ross also testified that Dr. Chopra offered to pay for her Uber and to let her use "the hotel room that comes with the table." *Id.* at 120:1–6.

Ultimately, Ms. Ross decided to attend the Gala and was seated at a table with Dr. Chopra and his wife, Ms. Hurley and her husband, and various other physicians and their spouses. Hurley Dep. at 28:18–29:18. While at the Gala, Ms. Ross spoke to Ms. Hurley about Dr. Chopra and told her that "Dr. Chopra had asked her if he should have his friend come up for the evening to keep him company, or if she was going to be keeping him company" and that Dr. Chopra "had a hotel room, that was paid for, that she could stay at." *Id.* at 38:1–39:12. Ms. Hurley testified that she asked Ms. Ross if she was uncomfortable and offered to give her a ride home, but that Ms. Ross declined. *Id.* at 39:14–40:2. She stated that Ms. Ross "was smiling, and seemed very happy about this conversation" and that when asked if she was uncomfortable, Ms. Ross stated that she was a "big girl" she could handle the situation herself. *Id.* Ms. Ross did not testify about this exchange.

After the Gala, Ms. Ross, Dr. Chopra, and two other physicians went to an "after party" at the MGM Grand. Ross Dep. 142:8–13. It is here that Ms. Ross alleges that Dr. Chopra followed her to the bathroom and sexually assaulted her. 156:7–157:3; 158:15–159:13. Specifically, Ms. Ross testified that Dr. Chopra "sat [her] on a stool and tried to put his hand up [her] dress and tried to kiss [her] and told [her] that he wanted [her] to stay at the hotel." *Id.* She also testified that he made lewd comments to her about her underwear, pushed them aside, touched her vagina, and placed her hand on his crotch. *Id.* Shortly after the alleged assault, Ms. Ross, Dr. Chopra, and the other two physicians left the MGM, stopped briefly for pizza, and went home. *Id.* at 157:4–9.

*Ms. Ross's Reports and Doctors's Investigation*

In her deposition, Ms. Ross testified that the morning after the 2017 Gala she informed her mother that Dr. Chopra had behaved inappropriately the prior evening but did not provide any details about the assault. Ross Dep. at 165:14–16. Ms. Ross testified that her mother urged her to report Dr. Chopra, but that she did not immediately do so because she feared for her job. *Id.* at 165:16–166:3. Ms. Ross's friend Stephanie McDonald testified that she had breakfast with Ms. Ross the morning after the Gala and stated that Ms. Ross was "extremely distraught," and told her the details of the alleged sexual assault. McDonald Dep. at 31:14–35:13.

At work on the Monday after the Gala, Ms. Hurley asked Ms. Ross how the rest of the evening at the Gala had gone. Ross Dep. at 166:6–10. Ms. Ross testified that she reported to Ms. Hurley that Dr. Chopra had been "inappropriate" but did not want to go into detail at that time. *Id.* at 170:18–171:3. Ms. Hurley testified that she did not believe there was anything to report after that conversation and that she did not "consider it sexual harassment" or "something she needed to report." Hurley Dep. at 132:4–9.

On January 12, 2018, Ms. Ross called Paul Hagens, Doctors's Vice Present of Human Resources, and reported that Dr. Chopra sexually assaulted her at the Gala. ECF 81-16, E-mail from Paul Hagens. On January 15, Ms. Ross reported the details of the alleged assault to Mr. Hagens, who assured her that he would notify Doctors's president and CEO, Phillip Down, and investigate her allegations. ECF 81-8, Hagens Dep. at 25:12–22; 27:16–21. Mr. Down met with Ms. Ross as well and asked her questions regarding the alleged assault. Ross Dep. at 222:12–20. Mr. Down also met with Dr. Chopra and the other physicians who attended the "after party" with Ms. Ross and Dr. Chopra. Hagens Dep. at 36:19–37:3. Dr. Chopra denied Ms. Ross's allegations and Mr. Down told Dr. Chopra to stay away from her. ECF 81-7, Chopra Dep. at 68:8–18.[2]

On January 26, 2018, after receiving a demand letter from Ms. Ross's attorney, Doctors asked EMA to remove Dr. Chopra from their hospital. *See* ECF 81-27, Letter from EMA. Doctors then hired Human Resource Strategy Group ("HRSG") as an independent investigator to look into Ms. Ross's allegations. ECF 81-24 HRSG Report. The independent investigators interviewed Dr. Chopra, Dr. Madan, Ms. Hurley, Ms. Christensen, Mr. Hagens, Mr. Down, and Doctors employees who worked with Ms. Ross. ECF 81-23, HRSG Interview Report. Ms. Ross refused to participate in the investigation. *Id.* at 4. The independent investigators concluded that Ms. Ross's allegations were unsubstantiated, HRSG Report at 8, and Dr. Chopra returned to the hospital, subject to certain conditions including participation in sexual harassment training. *See* Letter from EMA.

*Ms. Ross's Work Performance*

Sometime in the fall of 2017, Patricia Christensen, Doctors's Vice President for Patient Care Services and Chief Nursing Officer, informed Ms. Hurley that she had received multiple

---

[2]     Ms. Ross testified that sometime after her conversation with Mr. Down, Dr. Chopra came to her office and asked her "not to tell anybody what he did" and told her that she "had his whole career in his hands." Ross Dep. at 228:16–19.

complaints about Ms. Ross's job performance. Hurley Dep. at 119:4–5. Ms. Christensen identified several issues, including Ms. Ross's lack of discipline over her staff and poor leadership skills. *Id.* at 153:13–17. Ms. Christensen informed Ms. Hurley that she believed Ms. Ross's performance was unlikely to improve and wanted to offer Ms. Ross severance instead of placing her on a Performance Improvement Plan ("PIP"), which was the usual practice for addressing performance problems with supervisors like Ms. Ross. *Id.* at 153:21–154:4; 86:6–8.

Ms. Hurley testified that she had also received complaints that about Ms. Ross, including allegations that Ms. Ross showed favoritism among her nursing staff, improperly staffed her unit, and was AWOL during her shifts, reportedly because she had left the hospital to be with a man with whom she was romantically involved. *Id.* at 141:12–142:2. Ms. Hurley testified that she tried to coach Ms. Ross in hopes of avoiding placing her on a PIP, but that Ms. Ross's performance continued to deteriorate. *Id.* 149:16–150:19.

"In late October or early November 2017," Ms. Christensen discussed her concerns about Ms. Ross's performance with Mr. Hagens, "and sometime prior to January 11, 2018," Ms. Hurley and Mr. Hagens discussed placing Ms. Ross on a PIP. Hagens Dep. at 17:18–19:2. On January 11, 2018, Ms. Hurley met with Ms. Ross and informed her that she was on thin ice and at risk of being terminated. Ross Dep. at 182:11–183:2.  Ms. Hurley told Ms. Ross that she could either try moving forward on a PIP, or take a severance package. *Id.* Ms. Ross testified that she was surprised by this "ultimatum," but acknowledged that she had been made aware of certain concerns about her job performance prior to the January 11, 2018 meeting. Ross Dep. at 42:7–44:16; 185:6–186:11; 188:19–21. It was after this meeting that Ms. Ross contacted Mr. Hagens and reported that she had been assaulted at the Gala, and that she was concerned that her job performance issues were in

6

some way related to the fact that she had complained to Ms. Hurley about Dr. Chopra's behavior.

That evening, Mr. Hagens sent an email to Ms. Christensen and Ms. Hurley, which stated:

> What has me concerned now is that she shared some personal information with Lisa including the fact that a physician was inappropriate with her at the DCH Foundation gala on November 4 and that you both began treating her differently around Thanksgiving, including that Lisa postponed their scheduled 1:1 meeting 3 times. She believes the physician may be the cause of the action being taken against her.

Email from Paul Hagens.

On January 15, 2018, Ms. Ross met with Mr. Hagens, Ms. Christensen, and Ms. Hurley to discuss her job performance. Hagens Dep. at 25:10–12. Mr. Hagens testified that Ms. Ross's employment was not in jeopardy at that time and that "the plan was to provide her with a performance improvement plan in an attempt to help her be successful in her role." *Id.* at 33:9–12. On January 16, Mr. Down met with Ms. Ross, in large part to discuss her allegations against Dr. Chopra, and assured her that, with respect to her job, she "was going to be just fine." Ross Dep. at 230:10–18. Ms. Ross testified that Mr. Down's reassurances did not allay her concern that her job was in jeopardy and that there was no place for her at Doctors.

Ms. Christensen and Ms. Hurley met with Ms. Ross to review her PIP on January 24, 2018 and told her that they thought she would be successful. Ross Dep. at 208:14–209:9. On January 25, 2018, Ms. Ross left work early because she was feeling nauseous and never returned to the hospital. At the request of her attorney, Ms. Ross was placed on administrative leave, and she remained on paid leave until her resignation in April 2018. Ross Dep. at 211:15–21.

Additional facts will be supplied below as needed.

## STANDARD OF REVIEW

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* In reviewing the evidence related to a motion for summary judgment, the Court considers the facts in the light most favorable to the non-moving party. *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (U.S. 2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004).

## DISCUSSION

### I.    Dr. Chopra's Motion for Summary Judgment

Against Dr. Chopra, the second amended complaint asserts one count of assault and one count of battery for his alleged sexual assault on Ms. Ross at the MGM Grand following the 2017 Gala. SAC at 11–13. When it was first filed, it  also asserted a claim for Intentional Infliction of Emotional Distress ("IIED") against all Defendants, including Dr. Chopra. *Id.* at 13–14. On July

27, 2019, however, the parties filed a Stipulation of Partial Dismissal with Prejudice, which dismissed Ms. Ross's IIED claim with prejudice as against all Defendants. ECF 39, Stip. of Dismissal. The Court approved the Stipulation of Dismissal, but construed it in as a "a pleading amendment made with the opposing parties' written consent pursuant to Rule 15(a)(2). ECF 40, Paperless Order (citing *Williams v. Montgomery Cty.*, No. GJH-15-25, 2015 WL 4506806 at *2 (D. Md. July 23, 2015)).

Dr. Chopra argues that Ms. Ross's claims against him are barred in their entirety for two reasons. He argues *first* that the Stipulation of Dismissal with prejudice as to the IIED claim bars Ms. Ross's claims for assault and battery under the doctrine of *res judicata*. He argues *second* that Ms. Ross's failure to appoint an expert to testify regarding her emotional injury as a result of Dr. Chopra's alleged assault is fatal to her recovery for actual, compensatory, punitive, and emotional damages. I consider Dr. Chopra's arguments in turn.

A.    *Ms. Ross's claims against Dr. Chopra are not barred by res judicata*

Dr. Chopra argues that the parties' Joint Stipulation of dismissal with prejudice of the IIED claim against Dr. Chopra has a preclusive effect on the assault and battery claims brought against him in the same lawsuit. I disagree.

The elements of *res judicata* under Maryland law[3] are: "(1) that the parties in the present litigation are the same or in privity with the parties to the earlier dispute; (2) that the claim presented in the current action is identical to the one determined in the prior adjudication; and (3)

---

[3]    Maryland's *res judicata* principles apply to the state law claims against Dr. Chopra. *See Humane Soc'y of United States v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*, No. PWG-16-2029, 2017 WL 4467490, at *3 (D. Md. Oct. 6, 2017), *aff'd sub nom. Humane Soc'y of the United States v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 757 F. App'x 270 (4th Cir. 2019).

that there has been a final judgment on the merits." *Anne Arundel Cnty Bd. of Educ. v. Norville*, 887 A.2d 1029, 1037 (Md. 2005) (emphasis added).

Ms. Ross concedes that the parties to the assault and battery claims are the same as the parties to the IIED claim. She also concedes that "her IIED claim is identical to her assault and battery claim" under Maryland's "transaction" test, under which "a 'claim' includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction . . . out of which the claim arose." *Boyd v. Bowen*, 806 A.2d 314, 325–26 (Md. App. 2002). Ms. Ross disputes, however, that the Order dismissing the IIED claim with prejudice constitutes a final judgment on the merits and "doesn't agree that a 'prior action' exists" such that would preclude her present claims. Opp. to Doctors at 17.

It is clear under Maryland law that a stipulation of dismissal with prejudice "has the same res judicata effect as a final adjudication on the merits favorable to the defendant." *Claibourne v. Willis*, 702 A.2d 293, 297 (Md. 1997). Ms. Ross contends, though, that because the "proper mechanism for a plaintiff to withdraw some, but not all, claims is to file a motion to amend" under Rule 15, no prejudice attaches to the parties' Stipulation of Partial Dismissal with Prejudice, which was mistakenly filed under Rule 41. *See Elat v. Ngoubene*, 993 F. Supp. 2d 497, 519 (D. Md. 2014). Ms. Ross is correct that Rule 15 technically is the appropriate Rule under which a party may dismiss some, but not all, claims against a particular defendant. *Id*. She is also correct that I approved the parties' Stipulation of Partial Dismissal with Prejudice, but construed it "as a pleading amendment made with the opposing parties' written consent pursuant to Rule 15(a)(2)." ECF 40. But it does not follow from there that the parties' agreement to dismiss the IIED claim with prejudice has no effect.

10

The Fourth Circuit has found that while Rule 15, and not Rule 41, technically is the correct vehicle to effectuate piecemeal dismissal, "similar standards govern the exercise of discretion under either rule." *Skinner v. First Am. Bank of Virginia*, 64 F.3d 659 (4th Cir. 1995). Moreover, the Fourth Circuit has noted parenthetically that "whether plaintiff's motion is made under Rule 15 or Rule 41(a)(2), the choice of rules is largely a formal matter." *Id.* (citing 5 J. Moore, J. Lucas & J. Wicker, Moore's Federal Practice ¶ 41.06–1, at 41–92 to –93 (1995). *See also Flora v. Everest Wealth Mgmt., Inc.*, No. CV ELH-17-1621, 2017 WL 4280744 at *2 (D. Md. Sept. 26, 2017) (construing a Rule 41 motion to dismiss as a Rule 15 motion to amend and stating that "Plaintiff has agreed to dismiss her [] claim with prejudice.").

Here, there is no question that the parties agreed to dismiss the IIED claim against all defendants with prejudice. In fact, Ms. Ross's counsel suggested removing the "with prejudice" language from the Joint Stipulation, but acquiesced when defense counsel would not agree. *See* ECF 80-2. Ms. Ross cannot unring that bell due to what is effectively a citation error. Accordingly, I turn to whether Ms. Ross's decision to dismiss her IIED claim against Dr. Chopra with prejudice now bars her from continuing to pursue her assault and battery claims.

In support of his argument that the assault and battery claims are precluded, Dr. Chopra relies primarily on the general principle that the "effect of the dismissal with prejudice is the same as [if] a court entered final adjudication of the merits." *Claibourne*, 702 A.2d at 297. He argues that "a voluntary dismissal with prejudice has finality for *res judicata* purposes even if the litigation in which it occurs is not fully concluded," and cites two Maryland[4] cases that he contends

---

[4]     Dr. Chopra also cites several extra-jurisdictional cases in support of his argument. I do not find those cases persuasive in this Maryland state law matter.

compel a finding that Ms. Ross's assault and battery claims are precluded under Maryland law. Chopra MSJ at 5–6.

*First*, Dr. Chopra cites an unpublished opinion from this Court, *Newton v. Comcast of Md., LLC*, Case No. GJH-15-780, 2016 WL 94250 (D. Md. July 1, 2016). In *Newton*, the plaintiffs sought relief from Comcast in the Maryland Circuit Court for flood damage caused by Comcast's agent, a Maryland resident who was also named as a defendant. *Id.* The plaintiffs dismissed their claims against the agent with prejudice without appreciating that the agent's dismissal created complete diversity, and Comcast removed the lawsuit to this Court. *Id.* The plaintiffs then sought to amend their complaint to add the agent back into the suit, for the express purpose of destroying the diversity created by his dismissal. *Id.* at *4. The Court found that "[a]fter having already stipulated to the dismissal of Gaskins from the suit with prejudice[,] Plaintiffs may not now reassert their claims against him. Indeed, a dismissal with prejudice, regardless of the reason it is entered, operates as a final judgment against a party." *Id*.

*Newton* is easily distinguishable from this case. The plaintiffs in *Newton* dismissed with prejudice all allegations against the defendant agent, putting an end to the lawsuit against him in its entirety, and then attempted to revive  the same proceeding it had already agreed to dismiss with prejudice. The plaintiffs' attempted actions in *Newton* would be equivalent to Ms. Ross now attempting to reassert her claim for IIED—not to continue her pursuit of two different causes of action, which the parties never agreed to dismiss.

*Second*, Dr. Chopra cites *Langhoff v. Marr*, 568 A.2d 844 (Md. App. 1990), a decision from the Maryland Court of Special Appeals, which, if read fairly, produces a  very different result

than that attributed to it by Dr. Chopra.[5] In *Langhoff*, the defendant/appellant argued that the dismissal with prejudice of an assumpsit count precluded a claim for a breach of fiduciary duty that was brought in the same lawsuit and arose out of the same set of underlying facts. *Id.* at 847. The plaintiff/appellee countered that "it is permissible to join in a single action as many claims as he may have against a defendant" and that the "dismissal of one cause of action does not serve to bar all alternative causes of action simply because they arise from a common set of circumstances." *Id.* (emphasis added). The Court of Special Appeals agreed with the plaintiff and found as follows:

> The words "with prejudice" ... have, of course, a well-established meaning in the law. They signify that the dismissal is final, ***that the controversy is concluded and cannot be reopened by a new or subsequent action***. A dismissal "with prejudice" has been held to be as conclusive of the rights of the parties as if the action had been prosecuted to a final adjudication on the merits adverse to the complainant.... Therefore, the dismissal with prejudice of the assumpsit count conclusively determined that count "adverse to the complainant." The issue is whether the same can be said for the breach of fiduciary duty count. **In this case there is no new or subsequent action; one theory of recovery, in a single case, has been dismissed. It consistently has been held that proceeding concurrently under alternative theories in a case, both in contract and in tort is permissible. If, however, the causes of action are only technically different, or are the same, then dismissal with prejudice of one necessarily precludes litigation of the other**. We must decide whether the dismissed assumpsit count is the functional equivalent of the breach of fiduciary duty count.

*Id.* at 847–48 (bold added, italics in original).

The Court in *Langhoff* went on to conclude that "an assumpsit claim is fundamentally different from that of a breach of fiduciary duty. . . . In a nutshell, assumpsit requires the presence of a contract or promise, breach of fiduciary duty requires a duty arising from a special relationship that need not involve a contract. . . . Therefore, the two causes of action specifically require proof

---

[5]     The judgment in *Langhoff* was vacated for reasons not pertinent to its consideration in this case. *See Marr v. Langhoff*, 589 A.2d 470 (Md. 1991).

of distinct elements." *Id.* at 848. Accordingly, the Court held that "the dismissal with prejudice of the former will not preclude continued litigation of the latter." *Id.*

*Langhoff* is the only Maryland case the parties cite, and the only one I have found, that provides any guidance on how to assess this issue under Maryland law. Furthermore, I find that the analytical approach outlined in *Langhoff* is consistent with Maryland case law that articulates the elements of *res judicata* to specifically require a *subsequent litigation* when assessing a court's prior decision's preclusive effect under the transaction test. The following excerpt from *Anne Arundel County Board of Education v. Norville*, 887 A.2d 1029, 1037 (Md. 2005), is illustrative:

> The doctrine of res judicata bars the relitigation of a claim if there is a final judgment in a **previous litigation** where the parties, the subject matter and causes of action are identical or substantially identical as to issues actually litigated and as to those which could have or should have been raised in the **previous litigation**. Res judicata protects the courts, as well as the parties, from the attendant burdens of **relitigation**. This doctrine "avoids the expense and vexation attending **multiple lawsuits**, conserves the judicial resources, and fosters reliance on judicial action by minimizing the possibilities of inconsistent decisions.

(emphasis added).[6]

Accordingly, as outlined in *Langhoff*, I must assess whether IIED is the "functional equivalent" of assault and/or battery under Maryland law, as determined by whether the various causes of action "require proof of distinct elements." 668 A.2d at 848.

---

[6]     *See also Davis v. Wicomico Cty. Bureau*, 135 A.3d 419, 422 (2016) (A judgment between the same parties and their privies is a final bar to **any other suit** upon the same cause of action, and is conclusive not only as to all matters that have been decided in **the original suit**, but as to all matters which with propriety **could have been litigated in the first suit**....) (emphasis added); *Analytical Eng'g, Inc. v. Baldwin Filters, Inc.*, 425 F.3d 443, 453 (7th Cir. 2005) ("Generally speaking, res judicata does not apply to a court's redetermination of rulings made earlier in the same lawsuit. Res judicata requires: (1) a judgment on the merits *in an earlier suit;* (2) the same parties in the present suit and the earlier suit; and (3) the same causes of action in both suits.") (emphasis in original); *Kuhn v. State, Dep't of Revenue*, 897 P.2d 792, 795 (Colo. 1995) ("Because res judicata is not applicable to an earlier decision in the same lawsuit, the trial court erred in applying the doctrine.).

Under Maryland law, the elements of IIED are "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) The emotional distress must be severe." *Lasater v. Guttmann*, 5 A.3d 79, 89 (2010) (quoting *Harris v. Jones,* 281 Md. 560, 566, 380 A.2d 611 (1977)). The elements of civil assault are "(1) the plaintiff must allege that he or she was threatened by the defendant, who possessed the apparent present ability to carry out that threat . . . ; and (2) the defendant's actions must have raised in the plaintiff's mind an apprehension of imminent bodily harm[.]" *Griffin v. Clark*, No. RWT 11-2461, 2012 WL 4341677, at *4 (D. Md. Sept. 20, 2012); *Cont'l Cas. Co. v. Mirabile*, 449 A.2d 1176, 1183 (1982) ("An assault is any unlawful attempt to cause a harmful or offensive contact with the person of another or to cause an apprehension of such a contact."). Finally, the elements of battery under Maryland law "consist of the unpermitted application of trauma by one person upon any part of the body of another person." *Johnson v. Valu Food, Inc.*, 751 A.2d 19, 21 (2000).

Each of these causes of action is  distinct. Neither assault nor battery requires the plaintiff to prove "extreme and outrageous" conduct or severe emotional distress. And IIED does not require the plaintiff to be threatened by the defendant, to have any fear of imminent bodily harm, or to have any physical contact with the defendant.

Accordingly, I conclude that Ms. Ross's assault and battery claims against Dr. Chopra are not precluded by her dismissal with prejudice of her IIED claim against him. Dr. Chopra's Motion for Summary Judgment on this issue is denied.

B.    Damages

Dr. Chopra also seeks summary judgment because he contends that, as a matter of law, Ms. Ross is unable to recover any of the damages she seeks as a result of (1) failing to designate  an

expert with respect to her alleged actual and noneconomic damages, and (2) failing to specify that she seeks nominal damages in her Initial Damages Disclosure or her answers to interrogatories. As explained below, I conclude that Ms. Ross may recover nominal and punitive damages, but agree with Dr. Chopra that Ms. Ross is barred from recovering her medical costs and emotional distress damages.

*i. Ms. Ross may not recover actual damages in the form of medical costs.*

Ms. Ross seeks actual damages in the form of medical costs incurred as a result of Dr. Chopra's alleged assault and battery. Ms. Ross seeks to prove those damages with an invoice that provides a record of five therapy sessions, and a letter from her provider, a Licensed Clinical Social Worker, which provides:

> Ms. Ross was seen from 3/28/2018 to 4/25/2018 for 5 sessions. She presented with symptoms related to an incident on 11/4/2017 in which she was traumatized. Symptoms related to Acute Stress Disorder were evident along with Post Traumatic traits (sleep disturbances and flashbacks). Sessions focused on addressing the negative impact of the incident and developing coping for the ongoing symptoms. Although treatment was recommended, sessions ended due to the termination of insurance by the employer with the last two sessions unpaid.

ECF 87-10 at 5–6.

Dr. Chopra argues that Ms. Ross's failure to designate an expert to opine on the fairness and reasonableness of her medical costs bars their recovery. Chopra MSJ at 7. Ms. Ross did not respond to Dr. Chopra's argument regarding actual damages except to assert that no expert is required. *See* Opposition to Chopra at 21. Dr. Chopra may overstate the case by arguing that an expert opinion is absolutely prerequisite under Maryland law, but he is correct that Ms. Ross is barred from recovering her medical costs in this case.

Under Maryland law, medical bills are admissible in support of actual damages only if there is evidence that the amounts are fair and reasonable, and that the care provided was necessary.

*Desua v. Yokim*, 768 A.2d 56, 59 (Md. App. 2001). In *Brethren Mut. Ins. Co. v. Suchoza*, 66 A.3d 1073 (Md. App. 2013), the Maryland Court of Special Appeals reviewed the controlling case law on this issue and concluded that "it is clear that . . . evidence of the payment of appellee's medical bills does not establish the reasonable value of services for which the bills were rendered . . . [f]or the evidence of payment of appellee's medical bills to be admissible, [the plaintiff] has to adduce expert testimony *or other competent evidence* that the amount of such payment" was fair and reasonable.[7] (emphasis added).

A recent unreported opinion from the Maryland Court of Special Appeals, though not binding authority, states: "[The Appellant's] contention is incorrect, *expert testimony is not always required* to prove the reasonableness of medical bills" because reasonableness may be proven through other competent evidence. *Snee v. Snee*, No. 0399, Sept. Term, 2018, 2021 WL 732906, at *6 (Md. Ct. Spec. App. Feb. 25, 2021), *cert. denied*, 474 Md. 732, 255 A.3d 1097 (2021) (unreported) (emphasis added). In that case, the court found that a detailed explanation of benefits from a medical insurer might constitute other competent evidence of reasonableness. *Id.* Additionally, in *Desua v. Yokim*, the same Court concluded that "a billing manager is competent to establish that a particular bill is fair and reasonable by comparing what other hospitals charge for a particular procedure," although not to establish that such services were necessary. 768 A.2d at 144.

---

[7]     Citing *Shpigel v. White*, 741 A.2d 1205, 1211 (1999) ("In order for the amount paid or incurred for medical care to be admissible as evidence of special damages, there ordinarily must be evidence that the amounts are fair and reasonable."); *Kujawa v. Baltimore Transit Co*., 167 A.2d 96, 102 (1961)("The medical bills, absent a showing of reasonableness, were properly excluded. Evidence of the amount or payment of medical bills does not establish the reasonable value of the services for which the bills were rendered or justify recovery therefor."); *Desua*, 768 A.2d at 56 ("Appellant, however, was also required to prove that her medical treatments were necessary.").

Ms. Ross does not dispute that she did not designate an expert under Fed. R. Civ P. 26(a)(2) to opine on the fairness, reasonableness, and necessity of her medical costs, and she has not cited any "other competent evidence" that might satisfy those requirements. Accordingly, Ms. Ross's medical costs are not recoverable as a matter of Maryland law and Dr. Chopra's Motion for Summary Judgment is granted with respect to those costs.

> ii. *Ms. Ross's failure to designate an expert bars her recovery for noneconomic damages.*

Dr. Chopra argues next that Ms. Ross cannot collect noneconomic damages, *i.e.*, emotional distress damages, as a matter of Maryland law because she did not designate an expert witness to testify regarding the causal connection between the alleged assault and battery and her alleged emotional distress. Chopra MSJ at 7–14. For the reasons explained below, I agree.

Under Maryland law, damages for emotional distress are recoverable "provided that it is proximately caused by the wrongful act of the defendant and it results in a physical injury or is capable of objective determination." *Beynon v. Montgomery Cablevision Ltd. Pt'ship*, 718 A2d 1161, 1183 (Md. 1998).[8] If determining the cause of a plaintiff's emotional distress is a "complex medical question," Maryland courts require expert testimony to guide the jury on that issue. *Wilhelm v. State Traffic Safety Commission*, 185 A.2d 715, 719 (1962). "Whether a case involves a 'complicated medical question' is a fact-intensive inquiry." *Wiseman v. Walmart Stores, Inc.*, No. 1:16-CV-04030-SAG, 2017 WL 2865013, at *4 (D. Md. July 5, 2017).

Maryland's seminal case on this issue is *Wilhelm v. State Traffic Safety Comm'n*, 185 A.2d at 715. In *Wilhelm*, the Maryland Court of Appeals found:

---

[8]     Ms. Ross argues strenuously that the appropriate standard for intentional torts in Maryland is cause in fact, rather than proximate cause. *See* Opp. to Chopra MSJ at 23–25. The law she cites does not support that conclusion.

> There can be little doubt, we think, that a question involving the causes of emotional disturbances in a person sufficient to evoke, subconsciously, grossly exaggerated symptoms is an intricate and complex one, peculiarly appropriate for science to answer. To allow a jury of laymen, unskilled in medical science, to attempt to answer such a question would permit the rankest kind of guesswork, speculation and conjecture.

*Id.* at 719.

Subsequent decisions from the Maryland Courts of Appeal have restated, categorically, that "the causes of emotional disturbances are complicated medical questions, proof of which must be made by expert medical testimony." *State v. Allewalt*, 517 A.2d 741, 747 (Md. 1986) (quoting *Johnson v. Zerivitz*, 198 A.2d 254, 255 (Md. 1964)); *S.B. Thomas, Inc. v. Thompson*, 689 A.2d 1301, 1311 (Md. Ct. App. 1997).

Additionally, Dr. Chopra argues quite plausibly  that the existence of multiple other possible sources of Ms. Ross's alleged emotional distress complicates the picture such that it would require an expert opinion to parse whether Ms. Ross's distress was caused by Dr. Chopra's alleged wrongdoing, or other turmoil is Ms. Ross's life that was occurring contemporaneously. Chopra MSJ at 9–12.

The Maryland Court of Special Appeals has noted that "an otherwise simple issue of causation may become a complicated medical matter if under the facts of the case there is a possibility that the symptoms predated the emotional shock or arose from an independent source." *Hunt v. Mercy Med. Ctr.*, 710 A.2d 362, 375 (Md. Ct. App. 1998). It has also stated that it "is clear that evidence, including expert medical testimony, establishing the possibility of an alternative theory of causation may be the decisive factor that transforms a non-medically complicated question of causation, requiring no expert medical testimony, into a complicated medical question, requiring such testimony as a matter of law. Evidence of such an alternative theory of causation would be capable of performing this transforming function regardless of which party introduces it

and regardless of the stage of the trial at which it is introduced." *Am. Airlines Corp. v. Stokes*, 707 A.2d 412, 418–19 (Md. Ct. App. 1998).

The evidence in this case shows that Ms. Ross was experiencing other personal issues both before and during the time of the alleged assaults and battery. The Affidavit of Lisa Hurley, Exhibit 8 to Dr. Chopra's MSJ, affirms that sometime prior to Thanksgiving in 2017, Ms. Ross told Ms. Hurley that she was having serious marital problems and that Ms. Ross had told her children that she and her husband were splitting up. Christopher Ross confirmed in his deposition that he and his wife had separated and that he did not believe there was any hope of reconciliation. ECF 80-7, Christopher Ross Dep. at 13:4–12. He also testified that he and Ms. Ross were having marital problems in the summer of 2017, well before the Gala that November. *Id.* A friend and former colleague of Ms. Ross testified that Ms. Ross was involved in an ongoing extramarital affair with a married man, and that her paramour's ambivalence about leaving his wife and general failure to give Ms. Ross the attention she wanted was upsetting to her. DiCocco Dep. at 77. Furthermore, Ms. Ross herself alleges that she suffered emotional distress as a result of her employer's alleged gender discrimination, sexual harassment/hostile work environment, and retaliation. *See* SAC at ¶¶ 93; 100; 114.

Ms. Ross does not dispute these facts, nor does she offer any explanation for how a lay-jury could possibly differentiate between the emotional distress that resulted from Dr. Chopra's alleged assault, and the emotional distress that resulted from the various other sources of emotional turmoil in her life. She also offers no explanation for how a jury might accurately apportion emotional distress damages, which she seeks from both Defendants for completely different reasons. As noted in *Wilhelm*, "To allow a jury of laymen, unskilled in medical science, to attempt

to answer such a question would permit the rankest kind of guesswork, speculation and conjecture," and is not permitted under Maryland law.

Accordingly, because Ms. Ross has not designated[9] an expert to testify regarding the factually complicated issue of whether the cause of the emotional distress for which she now seeks compensation was Dr. Chopra's alleged assault and battery, or her many concurrent but unrelated stressors, Dr. Chopra's Motion for Summary Judgment is granted with respect to noneconomic damages.[10]

### iii. Ms. Ross may collect nominal and/or punitive damages

Dr. Chopra also argues that Ms. Ross is barred from recovering nominal damages because she did not state she was seeking nominal damages in her Initial Damages Disclosure, ECF 17, or her answers to interrogatories, ECF 80-3, even though she expressly seeks nominal damages in her Second Amended Complaint, SAC at 12. Chopra MSJ at 15. Dr. Chopra is mistaken. .

Dr. Chopra cites no Maryland authority, and I have found none, requiring nominal damages to be identified in a damages disclosure or answer to interrogatories, or even requiring nominal

---

[9]     The parties have not raised whether Ms. Ross's failure to designate an expert to opine on the reasonableness and necessity of her medical costs or her emotional damages "was substantially justified or is harmless" under Fed. R. Civ. P. 37(c). *See S. States Rack and Fixture, Inc. v. Sherwin-Williams Co.,* 318 F.3d 592, 597 (4th Cir. 2003). Thus, on the record presently before me, there is no factual basis for me to conclude that Ms. Ross should be allowed to belatedly designate such an expert at this time, and thus she has failed to meet her burden on summary judgment to identify facts that are capable of being proved at trial that would create a genuine issue of material fact regarding proof of emotional distress damages.

[10]     I note that this causation issue is not the same as the fairly straightforward testimony of Ms. Ross's treating therapist  that her treatment was reasonable for the mental health issues Ms. Ross was experiencing, and that her charges were fair and reasonable. In the face of the multiple mental health stressors that Dr. Chopra asserts were the actual cause of Ms. Ross's mental health injuries, expert testimony would be required, and, correspondingly, an appropriate disclosure under Fed. R. Civ. P. 26(a)(2)(B).

damages to be pleaded. The Fourth Circuit has found that nominal damages do *not* need to be pleaded under South Carolina law and stated:

> Nominal damages need not be specifically pleaded where a party alleges a claim for general damages; the general damage allegation sufficiently encompasses nominal damages. Furthermore, **where pleadings allege and evidence proves a willful invasion or infringement of a right, courts presume nominal damages, even if exact measurement of actual damages is not possible**.

*Liberty Mut. Fire Ins. Co., v. JT Walker Industries, Inc.*, 554 Fed. Appx. 176, 189–90 (4th Cir. 2014) (citations omitted) (emphasis added).[11]

Under Maryland law, similarly, it "is well settled that every injury to the rights of another imports damage, and if no other damage is established, the party injured is at least entitled to a verdict for nominal damages." *City of Baltimore v. Appold*, 42 Md. 442, 457 (1875). More recent Maryland case law provides that nominal damages are awarded "when an injury has been proven, but it is impossible to calculate the damages therefrom." *Kleban v. Eghrari-Sabet*, 920 A.2d 606, 627 (Md. Ct. App. 2007). And in the specific context of assault, the Maryland Court of Appeals has stated that "[a]n assault is one of those technical invasions of a person's bodily integrity which entitles him at least to nominal damages" even when he cannot "show actual damages from either demonstrable bodily injury or some form of subjective injury such as mental anguish, fright, humiliation, or pain and suffering." *Green v. Washington Suburban Sanitary Comm'n*, 269 A.2d 815, 822 (Md. 1970).[12] In light of these principles, I conclude that Ms. Ross was not required to

---

[11]    *See also Minnesota Laws. Mut. Ins. Co. v. Batzli*, 442 F. App'x 40, 46 (4th Cir. 2011) ("[B]ecause Minnesota Mutual failed to convince the court that nominal damages must be specifically plead or that a court is foreclosed from inferring such damages under the facts at hand, the court rejected Minnesota Mutual's [] argument.") (internal quotation omitted) (Virginia law).

[12]    *See also Schwartzbeck v. Loving Chevrolet, Inc.*, 339 A.2d 700, 703 (Md. Ct. App. 1975) ("In contradistinction with trespass and **other direct injuries for which the complainant is awarded nominal damages if he should fail to plead and prove actual damage**. . .") (emphasis added); *Brooks v. Jenkins*, 104 A.3d 899, 921 (Md. Ct. App. 2014) ("This decision does not, however, undermine the jury's threshold decision that the Deputies committed a common-law

include nominal damages either in her Damages Disclosure or her answers to interrogatories, and that she may recover nominal damages for Dr. Chopra's alleged assault and battery.

As a corollary, Dr. Chopra argues that Ms. Ross cannot recover punitive damages because it is well-settled under Maryland law that punitive damages cannot stand alone—there must first be recovery for actual, noneconomic, or nominal damages. *See Shabazz v. Bob Evans Farms, Inc.*, 881 A.2d 1212, 1233–35 (Md. Ct. App. 2005) ("It is a well settled proposition in Maryland law that a cause of action does not exist for punitive damages alone."). That is true as far as it goes, but it is of no help to Dr. Chopra here because I have already concluded that Ms. Ross may recover nominal damages, Dr. Chopra's point is moot for the time being.

For those reasons, Dr. Chopra's MSJ regarding Ms. Ross's claims for nominal and punitive damages is denied.

> *iv. There is a genuine issue of material fact regarding the later assaults alleged by Ms. Ross*

Dr. Chopra concludes his Motion with an ill-conceived argument that "Defendant Chopra did not assault Plaintiff on January 24 2018 or at any other time after the alleged November 4, 2017 groping." Chopra MSJ at 15. But, of course, this is a purely factual issue, which is genuinely disputed, and it is plainly inappropriate for resolution at the summary judgment stage. Dr. Chopra will have his opportunity to convince a jury of his version of the disputed facts. But they afford him no opportunity to escape the allegations against him on summary judgment.

Dr. Chopra's MSJ is denied with respect to the assaults that Ms. Ross alleges occurred after November 4, 2017.

---

trespass. Accordingly, and because the Jenkinses did not seek economic or actual damages for the common-law trespass, we remand with directions that the circuit court enter a judgment for nominal damages on that claim.").

## II. Doctors's Motion for Summary Judgment

Ms. Ross's second amended complaint alleges Doctors committed three separate Title VII violations: gender discrimination; sexual harassment – hostile work environment; and retaliation. SAC at 18–23. Doctors moves for summary judgment on all three counts. For the reasons explained below, Doctors's Motion is granted in part and denied in part.

### A.    Doctors's MSJ is granted with respect to Count VI, Gender Discrimination in violation of Title VII

Count VI of the second amended complaint alleges that Ms. Ross "has been the victim of unlawful discriminatory conduct in the workplace at the hands of Doctors . . and [its] employees, agents, and contractors"[13] and that she was "unlawfully subjected to disparate treatment and suffered adverse employment actions by Defendants on the basis of her gender" in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, *et seq.* SAC ¶ 90; 92. Ms. Ross did not respond to Doctors's arguments in support of summary judgment on Count VI, thus abandoning her gender discrimination claim. *See Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (finding that Plaintiff abandoned her Title VII claim by failing to address it in her opposition to Defendant's motion for summary judgment). Additionally, Ms. Ross has failed to present the evidence required to create a genuine issue of material fact as to her claim for gender discrimination under Title VII. Doctors's Motion for Summary Judgment on Count VI must therefore be granted.

Title VII prohibits employers from discriminating "against any individual with respect to [their] compensation, terms, conditions or privileges of employment" because of their gender. 42

---

[13]    The SAC alleges discriminatory conduct by "Doctors, DHI, and DCHC employees, agents, and contractors." SAC at ¶ 90. DCHC (Doctors Community Hospital Clinic, LLC) was dismissed by consent. ECF 40. Doctors states  in its filings that "the employer's correct legal name was Doctors Hospital, Inc., dba Doctors Community Hospital. Doctors MSJ at 7 n. 1.

U.S.C. § 2000e-2(a)(1). "There is no automatic presumption that every adverse personnel action directed at a female employee results in a violation of Title VII." *Riley v. Tech. & Mgmt. Servs. Corp.*, 872 F. Supp. 1454, 1460 (D. Md. 1995), *aff'd sub nom. Riley v. Tech. & Mgmt. Servs. Corp.*, 79 F.3d 1141 (4th Cir. 1996). Accordingly, Ms. Ross must identify evidentiary facts to create a genuine issue of material fact  that Doctors intentionally discriminated against her because she is a woman. *Id.*

A plaintiff may pursue two different avenues of proof to demonstrate a Title VII violation for disparate treatment based on gender: "(a) through direct evidence that gender . . . motivated" the adverse employment action taken against them, "or (b) through the burden-shifting scheme established by *McDonnell Douglas Corp.*, 411 U.S. 792 (1973)." *Schafer v. Maryland Dep't of Health & Mental Hygiene*, 359 F. App'x 385, 388 (4th Cir. 2009).

To prevail via the first avenue, known as the "mixed-motive framework" Ms. Ross must either show direct or circumstantial evidence that her gender was a motivating factor for Doctors's alleged adverse employment action. *Fuller v. Phipps*, 67 F.3d 1137 (4th Cir. 1995); *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). Ms. Ross has proffered no such evidence.

To prevail under the *McDonnell Douglas* framework, Ms. Ross "must carry the initial burden under [Title VII] of establishing a prima facie case of discrimination." 411 U.S. at 802. To establish a prime facie case of discrimination, Ms. Ross must establish (1) that she is a member of a protected class; (2) that she suffered from an adverse employment action; (3) that at the time the employer took the adverse employment action she was performing at a level that met her employer's legitimate expectations; and (4) that similarly situated employees outside of her protected class were treated more favorably. *Louis v. Sun Edison, LLC*, 797 F. Supp. 2d 691, 703 (D. Md. 2011); *McCormick v. Verizon Maryland Inc.*, No. CIV. 07-2399-RWT, 2009 WL

2449886, at *6 (D. Md. Aug. 7, 2009).  Should Ms. Ross succeed in making a "a showing sufficient to support a prima facie case," the burden then shifts to Doctors to provide a "legitimate, nondiscriminatory reason" for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802. If Doctors provides a legitimate explanation for the challenged action, the burden shifts back to Ms. Ross "to show that the employer's rationale is a pretext for discrimination." *Ragsdale v. Potter*, 235 F. App'x 173, 174 (4th Cir. 2007).

Ms. Ross is undisputedly a member of a protected class, and she has demonstrated, as explained in Sections II.B and II.C, *below*, that there are genuine issues of material fact as to whether she suffered an adverse employment action, and whether her job performance was meeting expectations at the time such action was taken. However, Ms. Ross has failed to cite any evidence that Doctors treated a similarly situated employee of a different gender more favorably. Moreover, she acknowledged in her Answers to Doctors's Interrogatories that she could not identify any such employee. *See* ECF 81-28 at Interrogatory No. 14.

Because Ms. Ross cannot satisfy the fourth element of a  Title VII gender discrimination claim, Doctors's Motion for Summary Judgment is granted as to Count VI of the second amended complaint.

B.   <u>Doctors's Motion for Summary Judgment is denied with respect to Ms. Ross's sexual  harassment claim, but granted with respect to constructive discharge.</u>

Ms. Ross alleges in Count VII of her second amended complaint  that she "has been the victim of sexual harassment culminating in constructive discharge at the hands of Defendants" and that Doctors permitted "Ms. Ross to be sexually harassed, without taking any measures to stop or prevent continued harassment," in violation of Title VII. SAC ¶¶95–101. Doctors seeks summary judgment on Count VII because, it alleges, "Doctors exercised reasonable care to prevent and correct unwelcome sexual harassment of its employees" and because it took reasonable corrective

actions in response to Ms. Ross's eventual complaint to human resources. Doctors MSJ at 19–20. Accepting Doctors's theory would require making multiple conclusions of disputed fact in its favor and is therefore inappropriate for resolution on summary judgment.

A claim for hostile work environment based on sexual harassment is actionable under Title VII if the plaintiff shows that "(1) that she was harassed 'because of' her 'sex'; (2) that the harassment was unwelcome; (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer." *Smith v. First Union Nat. Bank*, 202 F.3d 234, 241 (4th Cir. 2000).

Because Doctors does not challenge the first three elements listed above, I assume without deciding for the purposes of this Motion that Ms. Ross was harassed because of her sex, that the harassment was unwelcome, and that the harassment was sufficiently severe or pervasive to create an abusive working environment. All that remains is to determine whether liability for Dr. Chopra's alleged conduct can be imputed to Doctors.

Doctors contends that liability for Dr. Chopra's alleged harassment cannot be imputed to Doctors because "the *Faragher/Ellreth* affirmative defense" acts as a complete bar to its liability. In a case where a co-worker allegedly sexually harassed a plaintiff-employee, "the employer may be liable . . . if it knew or should have known about the harassment and failed to take effective action to stop it." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 335 (4th Cir. 2011). "A valid *Faragher-Ellerth* affirmative defense," so named for the United States Supreme Court Decisions in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Indus., Inc. v. Ellereth*, 524 U.S. 742 (1998), "exists if (1) the employer exercised reasonable care to prevent and correct any harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of the

preventive or corrective opportunities that the employer provided." *Lacasse v. Didlake, Inc.*, 712 Fed. App'x. 213, 237 (4th Cir. 237).

An employer's "distribution of an anti-harassment policy provides compelling proof that the company exercised reasonable care in preventing and correcting harassment." *Id.* To overcome this "compelling proof," a plaintiff must demonstrate by a preponderance of evidence that "the policy was either adopted or administered in bad faith or that it was otherwise defective or dysfunctional." *Id.*

Doctors did distribute a sexual harassment policy detailing the procedure an employee should follow when they "feel [they] are being subject to sexual harassment or intimidation." ECF 81-15, Doctors Policy. The procedure outlined in the Doctors Policy is as follows:

I.      An employee who feels he/she is being subjected to sexual harassment or intimidation should confront the individual who is engaging in the objectionable conduct and indicate such actions are unwelcome and will be reported if continued.

II.     An employee is free to bring such complaints to the attention of his/her department head without fear of recrimination; or bring directly to the Human Resources Department, Director of Employee Relations.

III.    Investigations of sexual harassment or intimidation will be made swiftly and in a discreet manner with every effort to maintain confidentiality and mutual respect for all employees involved.

IV.    Investigations and discussions will be limited only to those persons who "need to know."

V.     A finding of sexual harassment will constitute grounds for progressive discipline up to and including discharge.

VI.   A finding that an employee has made false statements or interferences will be subject to progressive discipline up to and including discharge.

*Id.*

Whether the Doctors Policy was adopted or administered in bad faith, or was otherwise defective or dysfunctional, is a question that must be submitted to a jury. *See Zaire v. Protective Servs. Training Acad., LLC,* No. 8:17-CV-01185-PWG, 2019 WL 2289999, at *14 (D. Md. May

29, 2019).[14] On the record before me, a reasonable jury could conclude that Ms. Ross's statement to Ms. Hurley that Dr. Chopra had "been inappropriate" with her the night of the Gala, particularly in light of the conversation the two women had at the event, constituted a complaint to her employer that brought about no further action by Doctors. *See Howard v. Winter*, 446 F.3d 559, 571 (4th Cir. 2006) ("Title VII also places significant responsibilities on employers in reasonably responding to employee allegations."). A reasonable jury might also conclude that Ms. Ross's superiors took disciplinary action against her in response to her statement to Ms. Hurley—indeed, Mr. Hagen's email to Ms. Christensen and Ms. Hurley on January 12, 2018, ECF 81-16, notes that he was "concerned" that Ms. Ross believed "the physician [who assaulted her] might be the cause of this action being taken against her." Either of these factual findings might lead a reasonable jury to conclude that the Doctors Policy was administered in bad faith, or was defective or dysfunctional as applied to Ms. Ross.

Additionally, these same factual issues bear directly on whether Doctors "exercised reasonable care to prevent and correct any harassing behavior" and whether Ms. Ross "unreasonably failed to take advantage of the preventative or corrective opportunities" that Doctors provided, as required to successfully invoke a valid *Faragher-Ellreth* affirmative defense. The Fourth Circuit's decision in *Hoyle* is instructive on this point:

> A reasonable juror could reasonably conclude on this record that Freightliner had actual or constructive notice of the sexually harassing incidents and displays and failed to follow its own policies calling for a firm response designed to end the harassment. . . . Moreover, a reasonable juror could conclude that Freightliner did

---

[14]    *See also Hoyle*, 650 F.3d at 335 ("The question is not whether Freightliner's response to the complaints was inadequate as a matter of law. Rather, bearing in mind that the plaintiff need prove only that Freightliner failed to exercise reasonable care, and bearing in mind that at the summary judgment stage, all facts are viewed and all inferences are drawn in favor of the non-movant, here Hoyle, the issue is whether a genuine issue for trial on Freightliner's allegedly negligent response is presented.").

not promptly or effectively enforce its own anti-harassment policies based on its repeated failure to investigate. . . .

On this record, a reasonable juror could well find under proper instructions that Freightliner had a reasonably effective anti-harassment policy and that during the period May through November 2005, it reasonably executed that policy in the face of Hoyle's numerous complaints. **Of course, that reasonable juror would not be *compelled* so to conclude, and could reasonably reach a contrary finding**. Such a juror could find, as we have observed in analogous circumstances, that 'the problem with the [] policy lies not in theory but in practice.' **Accordingly, we are satisfied that the district court erred in concluding that Hoyle failed to generate a genuine dispute of material fact as to whether Freightliner exercised reasonable care in foreclosing and/or effectively responding to Hoyle's alleged victimization through co-worker sexual harassment.**

650 F.3d at 335-36 (quoting *Merritt v. Old Dominion Freight Line, Inc.,* 601 F.3d 289, 297 (4th Cir.2010)) (emphasis added). The Fourth Circuit's reasoning in *Hoyle* applies with equal force on this factual record. Accordingly, Doctors's MSJ must be denied with respect to Ms. Ross's sexual harassment claim.

Notwithstanding my conclusion that summary judgment is not appropriate on Ms. Ross's sexual harassment claim, I conclude that Ms. Ross has failed to meet the standard for constructive discharge. To prove constructive discharge, Ms. Ross must demonstrate that her "working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign," and that she actually resigned because of those conditions. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211–12 (4th Cir. 2019). Intolerability is a high standard. It "is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision," but rather "is assessed by the objective standard of whether a reasonable person in the employee's position would have felt *compelled* to resign, that is, whether he would have had *no choice* but to resign." *Id.* at 212 (emphasis in original).

Doctors points out in its motion that Ms. Ross "does not state that the harassing behavior by Dr. Chopra is what compelled her to resign; rather . . . she decided to quit when [Ms.] Hurley met with her and informed her she would be placed on a PIP because she felt there was no longer a place for her at Doctors[.]" Doctors MSJ at 21. Ms. Ross's Opposition to Doctors motion confirms this, stating that Ms. "Ross's resignation was a reasonably foreseeable consequence of telling her that she should resign because she was not going to be successful . . . a reasonable jury could find that a meeting where it was strongly implied that [Ms.] Ross was going to be fired satisfied this standard." Opp. to Doctors at 15. Whether or not Ms. Ross's resignation was foreseeable is beside the point. The question is whether a reasonable jury could conclude that a reasonable employee in Ms. Ross's shoes would feel they had no choice but to resign. The facts surrounding Ms. Ross's resignation, even construed in the light most favorable to her, do not rise to the required level of intolerability. Accordingly, Doctors's MSJ with respect to Ms. Ross's constructive discharge is granted.

C.    Doctors's Motion for Summary Judgment is denied with respect to Ms. Ross's claim for retaliation in violation of Title VII.

Doctors argues finally that it is entitled to summary judgment on Count VII of Ms. Ross's second amended complaint which alleges that Doctors took retaliatory action against her in response to her complaints about Dr. Chopra in violation of Title VII.

"Title VII's Opposition Clause, by its terms, prohibits retaliation against an employee who has opposed any practice made an unlawful employment practice by Title VII." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015). To succeed on a Title VII retaliation claim, a plaintiff must show that (1) she "'engaged in protected activity,'" (2) the employer "'took adverse action against [her],'" and (3) "'a causal relationship existed between the protected activity and the adverse employment activity.'" *Westmoreland v. Prince George's County, Md.*, 876 F. Supp.

2d 594, 612 (D. Md. 2012) (quoting *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)). Once

again, the *McDonnell Douglas* burden-shifting framework applies, *see* Section II.A, *above*, and

the first question is whether Ms. Ross has made a prima facie showing that Doctors terminated her

in retaliation for reporting Dr. Chopra's harassing behavior to Ms. Hurley and/or Mr. Hagen. *See

IJames v. Autumn Corp.*, No. 1:08CV777, 2009 WL 2171252, at *8 (M.D.N.C. July 20, 2009);

*Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006).

An employee engages in protected activity "when she opposes not only employment

actions actually unlawful under Title VII but also employment actions she reasonably believes to

be unlawful." *Boyer-Liberty v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015). The

reported violation "may be complete, or it may be in progress . . . . In other words, an employee is

protected from retaliation when she opposes a hostile work environment that, although not fully

formed, is in progress." *Id.*

Regarding Ms. Ross's complaint to Mr. Hagens, there can be no good faith dispute that an

employee making a complaint to HR alleging a co-worker sexually harassed and assaulted her is

a protected activity under Title VII. And although Ms. Ross's comments to Ms. Hurley present a

closer case, considering their context and construing the facts in her favor, Ms. Ross's remarks to

Ms. Hurley might also constitute protected activity. Before the Gala, Ms. Ross told Ms. Hurley

that she did not want to attend because Dr. Chopra made her uncomfortable. During the gala, Ms.

Ross told her that Dr. Chopra made remarks about a hotel room and keeping him company that

night. And the following Monday, when Ms. Hurley asked about how the night of the Gala had

ended, Ms. Ross told her that Dr. Chopra acted inappropriately. I agree with Ms. Ross that "these

facts would allow a reasonable jury to conclude that Ross engaged in protected activity

immediately after the gala and two months before that same supervisor suggested that she resign rather than be put on a PIP." Opposition to Doctors at 17.

Next, Ms. Ross must make a prima facie showing that Doctors "took adverse action against" her. Doctors contends that placement on a PIP/the choice between severance and a PIP does not constitute an adverse employment action because it does not affect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Doctors MSJ at 15, 24. Perhaps, but that is not the standard applicable to determining whether an employer has taken an adverse action against a plaintiff in a Title VII retaliation case. The Fourth Circuit explains:

> The scope of Title VII's anti-retaliation provision, § 2000e-3, is broader than the anti-discrimination provision . . . . [A]s the Supreme Court has held, "the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm" because "an employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." **Accordingly, retaliatory actions need not "affect the terms and conditions of employment" to come within Title VII's prohibition. However, retaliatory actions do have to be "materially adverse"—such that they "might have dissuaded a reasonable worker" from engaging in protected activity.**

*Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 327 (4th Cir. 2018) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62–64 (2006)) (emphasis added).[15]

Under the correct Title VII retaliation standard, Ms. Ross need only demonstrate that Doctors took some action that might have dissuaded a reasonable employee from "making or

---

[15]    *See also Laird v. Fairfax Cty., Virginia*, 978 F.3d 887, 893 n. 6 (4th Cir. 2020) ("As we noted in *Strothers v. City of Laurel*, some cases in our Circuit have recited the standard of a retaliation claim as requiring an 'adverse employment action' or activity rather than simply an 'adverse action.' But we have recognized that this formulation was expressly rejected by the Supreme Court in *Burlington*. So we continue to adopt the 'adverse action' formulation to describe retaliation claims since the action need not be employment- or workplace-related.").

supporting a charge of discrimination." *Reed v. Airtran Airways*, 531 F. Supp.2d 660, 670–71 (D. Md. 2008).

Ms. Ross testified, and Ms. Hurley largely confirmed, that Ms. Ross was told during her meeting on January 11, 2018, that she was close to being fired and that she had a choice between taking severance or being placed on a performance improvement plan. Ms. Ross also testified that she believed the PIP would be unsuccessful and that she would be terminated, and Ms. Hurley confirmed that "any time you're on a performance improvement plan, if you're not successful . . . it could result in termination; therefore your position does come in jeopardy." Hurley Dep. at 140: 6–10. Considering this evidence in the light most favorable to Ms. Ross, I conclude that the threat of a PIP under these circumstances might well have dissuaded a reasonable employee from reporting a Title VII violation and that Ms. Ross has presented a prima facie claim that Doctors took adverse action against her. *See Marley v. Kaiser Permanente Found. Health Plan*, No. 17-CV-1902-PWG, 2021 WL 927459, at *7 (D. Md. Mar. 11, 2021) ("And so too did Kaiser take adverse action against him by both placing him on the December 2014 PIP and issuing a written warning.").

Finally, Ms. Ross must demonstrate a causal relationship between reporting Dr. Chopra's alleged harassment and the adverse action taken against her. "Establishing a causal relationship at the prima facie stage is not an onerous burden. . . . An employee may establish prima facie causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers*, 895 F.3d at 335–36.

Ms. Ross testified that she told Ms. Hurley, before the Gala and alleged sexual assault, that Dr. Chopra made her uncomfortable. At the Gala, Ms. Ross and Ms. Hurley spoke about Dr.

Chopra's alleged suggestion that Ms. Ross stay with him in a hotel room. And the following Monday, Ms. Ross told Ms. Hurley that Dr. Chopra had behaved inappropriately. Less than two months later, Ms. Ross was informed that her job was in jeopardy. In the light most favorable to Ms. Ross, a reasonable juror could conclude from that evidence that Ms. Hurley should have understood that Ms. Ross was engaged in protected activity on the Monday after the Gala, and took adverse action against her shortly thereafter. Accordingly, Ms. Ross has made the required prima facie showing to support her Title VII retaliation claim against Doctors.

Under the *McDonell Douglas* framework, the burden now shifts to Doctors to show a legitimate, nondiscriminatory reason for taking adverse action against Ms. Ross. *Westmoreland*, 924 F.3d at 725. Doctors's burden at this point is one of production, not of persuasion, and it involves no credibility assessment. *Id* at 726. Doctors states in its Motion that it "establishes legitimate, non-discriminatory reasons for placing Ross on a PIP: good faith concerns by Christensen and Hurley that Ross's performance and leadership over her department was rapidly declining in spite of coaching . . . The undisputed testimony and evidence establishes Christensen and Hurley had good faith opinions based on data, observation, and numerous complaints by staff members that Ross's performance deteriorated to the point of warranting a PIP." Doctors MSJ at 23. Indeed, Ms. Hurley testified at length regarding complaints about Ms. Ross's performance, and also testified that Ms. Christensen believed Ms. Ross was "dead in the water" with respect to her employment at Doctors. Hurley Dep. at 141:12–145:10; 153:13–154:4. This testimony suffices to present a legitimate, non-discriminatory reason for placing Ms. Ross on a PIP.

At the final *McDonnell Douglas* stage, the burden shifts back to Ms. Ross and I must determine "whether she presented sufficient evidence for a jury to conclude that" Ms. Ross's declining job performance was the actual reason Doctors placed her on a PIP, or if Doctors's non-

discriminatory explanation is merely pretextual, and its true motivation was retaliation for Ms. Ross's reports of sexual harassment and assault. *Westmoreland*, 924 F.3d at 726. The Fourth Circuit has held that a plaintiff must demonstrate that retaliation was the "but-for" cause of the adverse employment action under Title VII. *Carr v. Maryland Grocery Store Co.,* No. CV GLR-17-244, 2019 WL 1427779, at *10 (D. Md. Mar. 29, 2019) (citing *Staley v. Gruenberg*, 575 F. App'x 153 (4th Cir. 2014) (unreported)). "Further, the Fourth Circuit has held that if the employer made the employment decision adverse to the plaintiff with a mixed motive—that is, for both a discriminatory and a nondiscriminatory reason—then the employer is not liable. In other words, causation requires disability to be more than a motivating factor: it must be *the only* motivating factor." *Id.* (quoting *Davis v. W. Carolina Univ.*, 695 F.App'x 686, 688 (4th Cir. 2017) (emphasis in original).

This is a close question in this case, but for two reasons, I conclude that it would be inappropriate to resolve Ms. Ross's retaliation claim on summary judgment, and that it must proceed to a jury.

*First*, Doctors cites no documentary evidence to support its claim that there were many and varied complaints about Ms. Ross's job performance. In fact, the only documentary evidence before me regarding Ms. Ross's job performance is a performance review completed one month prior to the 2017 Gala, which awards Ms. Ross 79 out of a possible 85 points, notes that she "is well respected by her colleagues," and concludes: "It is a pleasure to work with Glynda and I look forward to working with her in the coming year. Great job Glynda." ECF 86-2. The fact that the sole evidence of Ms. Ross's purported dramatic decline in performance is contained in witness testimony renders determining the motivating factor for placing Ms. Ross on a PIP a question of credibility that cannot be resolved on summary judgment. *Second*, relatedly, the timeline of events

leading up to Ms. Ross being placed on a PIP is not clear from the record before me. Doctors cites no definitive evidence that any complaints were made about Ms. Ross prior to any adverse action taken against her or, more to the point, prior to her remarks to Ms. Hurley regarding Dr. Chopra's behavior the night of the Gala. Doctors's Motion and the exhibits cited therein do not narrow the timeline of alleged complaints beyond stating they began "[d]uring the fall of 2017," which means they did not necessarily predate the November 4, 2017 Gala. *See* ECF 81-29, Affidavit of Lisa Hurley (Affirming that she received complaints about Ms. Ross "during the Fall of 2017."); ECF 81-5, Christensen Dep. at 103:21 ("I don't remember the dates [of the complaints]."). Only Ms. Hurley's testimony, which indicates that she did not "remember the timeline of each complaint," alleges that the complaints about Ms. Ross began in September or October of 2017. Hurley Dep. at 120:2–4; 148:1–3. Absent evidence of poor job performance predating Ms. Ross's complaints regarding Dr. Chopra, the issue of Doctors's motivation must be left for the jury.   Accordingly, Doctors's Motion for Summary Judgment as to Ms. Ross's claim for retaliation in violation of Title VII is denied.

## CONCLUSION

For the reasons outlined in this Memorandum Opinion, Dr. Chopra's Motion for Summary Judgment is GRANTED in part and DENIED in part and Doctors's Motion for Summary Judgment is GRANTED in part and DENIED in part.

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is by the United States District Court for the District of Maryland hereby ORDERED that:

1.    Defendant Puneet Chopra's Motion for Summary Judgment, ECF 80, is GRANTED in part and DENIED in part;

2.      Defendant Doctors Community Hospital's Motion for Summary Judgment, ECF

81, is GRANTED in part and DENIED in part.


DATED this __28th__ day of __December, 2021__         _____/S/_____

                                                  Paul W. Grimm
                                                  United States District Judge